UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------------------------x  Case No:  7:17-cv-03726

WILLIAM LOVELAND COLLEGE Inc.

                                        Plaintiff,


                    v.                                        **Verified Complaint**


DISTANCE EDUCATION ACCREDITION COMMISSION,

                                        Defendant.

-------------------------------------------------------------------------------------x


### VERIFIED COMPLAINT FOR DECLARATORY JUDGMENT
### AND INJUNCTIVE RELIEF, AND DAMAGES

### GENERAL ALLEGATIONS

Plaintiff William Loveland College Inc. as and for its verified complaint, by its undersigned attorney, respectfully avers:

1.  William Loveland College Inc., hereinafter "the College" or "the school",  is a not-for-profit degree-granting institution located in Loveland, Colorado.  The College seeks compensatory and punitive damages, and equitable relief for  1)  the arbitrary and capricious decision by the Distance Education Accreditation Council, hereinafter "DEAC" or "the agency", resulting in a public cause show action against the College,  2) public statements issued by DEAC to justify the aforesaid public show cause action,  and 3) manipulation by DEAC of official reports masquerading as findings of facts, accompanying the aforesaid show cause action,  all in connection with a tortious,  materially erroneous, vindictive, and defamatory public show cause action by DEAC of and about the College on February 27, 2017.

2.  In addition, the College seeks damages from DEAC as the result of DEAC's breach of contract, its interference in the College's contractual relationships, and an action based on DEAC's negligence.

3.  Despite the College's outstanding performance in every measure required for accreditation, acknowledged by DEAC in writing over a period of years and including correspondence only a few months prior to its most recent report, DEAC made a  calculated, cynical and self-serving political decision to take unwarranted negative public action against the College.

4.  In doing so, DEAC egregiously violated its own clearly established internal procedures which required it to provide to the College an opportunity to address and remedy any alleged areas of non-compliance, such as defects in the operation or other status and performance issues.  DEAC was also required, by its contractual obligation with the College, to accept and consider relevant evidence submitted by the College in response to its multiple duplicative and burdensome requests.  DEAC denied the College due process under law and failed to comply with 34 C.F.R. § 602.20(a) limiting the length of an accreditor's investigation, 34 C.F.R. § 602.18(b) ensuring controls against inconsistent application of standards, and 34 C.F.R. § 602.18(d) having a reasonable basis for determining that the information the agency relies on for making accrediting decisions is accurate. DEAC, acting in its own perceived political interest, and in a vindictive and retaliatory manner, determined to issue negative public action against the College without ensuring a reasonable basis for determining that the information relied upon for making their accreditation decisions was accurate, and by doing so destroyed the reputation and not-for-profit revenue operations of  and for the College, without providing any opportunity for the College to correct the false information.

5.  As set forth below, DEAC manipulated the name of the school, changed many important dates in official reports, purposefully omitted exculpatory evidence material to accreditation

decisions, and fabricated many instances of non-compliance in order to have a pretext upon which to advance DEAC's own political interests at the expense of the College.  In so doing, DEAC breached its contract with the College and caused great damage to the College.

6.   The College seeks damages for the harm caused by DEAC's arbitrary and capricious and wholly unjustified public assault on the integrity and status of the College, all of which constitutes a breach of contract and a tortious interference with the operations of the College.

7.   Through its arbitrary and capricious public actions DEAC purposefully placed the College in an impossible situation, publicly placing the school on show cause while simultaneously ignoring six years of coordination between DEAC and the College and instructing the College that to proceed the College would need to reapply for accreditation as a new applicant and new school. If the College is a new applicant it cannot be on show cause, and if the College is on show cause it cannot be a new applicant,  a this is an impossible contradictory state. DEAC, at all relevant times, was fully aware of this fact which it employed in a cynical manner with the intent to harm the College.

8.   Because of DEAC's illegal conduct, the College is no longer a credible or attractive choice for students seeking an M.B.A. degree.  Since it is impossible for the College to operate as a new accreditation applicant while simultaneously being on public show cause, the College will not be eligible to participate in Title IV federal student aid programs.   This will result in a loss of future students and future tuition revenue.  Since it is impossible for the College to operate as a new accreditation applicant while simultaneously being on public show cause, investors will not invest in the College.   Since it is impossible for the College to operate as a new accreditation applicant while simultaneously being on public show cause, the College will no longer be an attraction for grant money.  Since it is impossible for the College to

operate as a new accreditation applicant while simultaneously being on public show cause, the professional educators who operated the school will suffer a loss of reputation and will be not be employable in the education industry.  Aside from the risk of closure, the baseless public actions have irreparably harm the College's goodwill and reputation, as well as the goodwill and reputation of the College's principals, in the professional education community, and make it extremely unlikely that new students will enroll and current students complete their course of studies at the College.  DEAC'S conduct, as set forth in this Verified Complaint, was wanton and willful.

PARTIES

9.   The College is a Colorado not-for-profit corporation with its principal place of business in Loveland, Colorado.  William Loveland College started as the College of Advanced Traffic and Academy of Advanced Traffic, which were founded in the United States in 1923 with the mission of bringing education to the emerging field of traffic management with a special focus on education designed to ensure an understanding of the ICC's Rules of Practice. In 1996, the school transitioned to a distance based education model to leverage emerging technological opportunities in emerging education markets. In 2001, the school received national accreditation from the Distance Education & Training Council (DETC) a US Department of Education approved accreditor and a member of the Council on Higher Education Accreditation (CHEA). DETC, now known as "DEAC," is the Defendant in this case.  In 2013, the College added a location in Loveland Colorado. In 2014, the College changed its name to William Loveland College to reflect a strong connection to the local community and deep history within Colorado. On September 14, 2014 operations were consolidated to the Loveland Colorado location.

10. Upon information and belief DEAC is a Virginia corporation with its principal place of business in Washington, D.C. DEAC accredits schools in various states of the United States, including New York, from which it receives substantial revenues. At all times relevant hereto, DEAC is and has been an accrediting agency recognized by the U.S. Secretary of Education, pursuant to 20 U.S.C. § 1099b.

## JURISDICTION AND VENUE

11. This Court has subject matter jurisdiction pursuant to the following statutes: (1) 28 U.S.C. § 1331, in that this is a civil action arising under the Constitution and the laws of the United States, including under the Federal common law; (2) 28 U.S.C. § 1343(a)(4), in that the Plaintiff seeks equitable relief under the higher Education Act of 1965, as amended, 20 U.S.C. § 1099b(f) for the protection of its civil rights; providing exclusive jurisdiction for disputes with recognized accrediting agencies; (4) 28 U.S.C. §1332 in that there is a complete diversity of citizenship between DEAC and the College; and the amount in controversy exceeds $75,000; and (5) 28 U.S.C. § 1367, which provides this Court with supplemental jurisdiction over the College's state law claims.

12. This Court has personal jurisdiction over DEAC as a not-for-profitcorporation doing substantial business in the Southern District of the State of New York. See NY CPLR 302(1).

13. Venue for this action is proper in this judicial district and division under 28 U.S.C. DEAC accredits both the New York Institute of Photography and the New York Institute of Art and Design, from which schools, upon information and belief, DEAC receives substantial revenues, both located in the Southern District of the State of New York.

**SPECIFIC ALLEGATIONS**

14. DEAC is an institutional accrediting agency for institutions of higher education such as the College and is recognized by the Department of Education.  The College has been accredited by DEAC (formerly "DETC") since 2001.

15. The College enjoys an exceptional reputation and broad support in the education community and among the Loveland, Colorado community.  The College has a long and storied history which is respected by its community.  William Loveland College started as the College of Advanced Traffic and Academy of Advanced Traffic, which were founded in the United States in 1923 with the mission of bringing education to the emerging field of traffic management with a special focus on education designed to ensure an understanding of the ICC's Rules of Practice. The College of Advanced Traffic had campuses in Illinois, Colorado, and Missouri, the Academy of Advanced Traffic had campuses in Pennsylvania and New York. All campus locations were administered from the main headquarters in Illinois and all locations used the same published course materials; they are collectively referred to here as the "College".  The United States government formed the Interstate Commerce Commission (ICC) in 1887 to ensure fair rates, to eliminate rate discrimination, and to regulate other aspects of common carriers with a primary focus on rail transportation and carriers. The ICC's powers expanded through the turn of the century and into the 1920's. One standard set by the ICC was the "Rules of Practice" that companies and individuals were legally bound to follow.  On May 1, 1929, the ICC announced the formation of a qualifying BAR examination in addition to its Rules of Practice, requiring examination and registration of all regular practitioners. In later years,  this requirement included at least two years of formal law school education. Further, in

1935 the US passed the Motor Carrier Act, which amended the 1887 Interstate Commerce Act to additionally regulate bus lines and trucking as common carriers. With this regulation, the College established itself as a prominent education source and law school graduating students qualified to sit for and pass the ICC BAR, which now covered all major forms of transportation.  The College grew to be the preeminent source for ICC BAR preparation and attracted students from all over the country, including many practicing attorneys who also wanted to practice in the transportation markets.  ICC Practitioners (as they became known), were licensed to practice Interstate Commerce Law, including the ability to be recognized for arguing cases in transportation legal matters up to and including the United States Supreme Court. This made the College's education very valuable and unique, as several graduates did argue Interstate Commerce Law cases at the highest level of the courts.  The College was prominent for many years and in 1951 began publication of the legal guide "Transportation and Traffic Management", which became a staple publication found in nearly all law offices in the country of the time, which was in publication until 1976, growing to 1,700 pages in four volumes, and with a total of 14 editions published. Each of these volumes represented a semester of study in one of the two degree programs offered by the College: Degree in Transportation Management and the Degree in Transportation Law. These were each two - year degrees equivalent in today's terms to an Associate of the Arts (A.A.) degree, however at the time they also served as first professional degrees allowing entry into the ICC Practitioner field through the ICC BAR examination.  The College prospered in this environment for over 50 years.  The US Congress passed various deregulation measures starting in the 1970s which began reducing ICC authority. This included the Railroad Revitalization and Regulatory Reform Act of 1976 ("4R Act") and the Motor Carrier Act of 1980.  Full deregulation finally came on October 14, 1980, when President Jimmy Carter signed into law the Staggers Rail Act

(named for Democratic Congressman Harley Orrin Staggers of West Virginia). This ended the ICC BAR requirement.  The College continued to provide education and degrees concerning transportation, however the newly deregulated markets required curriculum focused on transportation efficiencies and supply chain management designed to take advantage of new market opportunities. In 1987 the main offices of the College were moved to New Jersey and the name was changed to the Institute of Logistical Management (ILM). The name change brought a formal change to the institute's mission to reflect the new emerging market. The new mission brought a focus on providing education to students in the logistical and supply chain markets, a natural shift given the deep levels of expertise and knowledge that surrounded the College and its graduates for over 60 years.  In 1996, the school transitioned to a distance based education model to leverage emerging technological opportunities in emerging education markets. In 2001 ILM received national accreditation from the Distance Education & Training Council (DETC) a US Department of Education approved accreditor and a member of the Council on Higher Education Accreditation (CHEA). Some 2,500 companies, government agencies, railroads, motor carriers and freight forwarders have hired many of the near 100,000 alumni of the school over the 90-year history.  In 2013 ILM added a location in Loveland Colorado, close to the training center used by the College in the 1960's. In 2014 ILM changed its name to William Loveland College to reflect a strong connection to the local community and deep history within Colorado. On September 14, 2014 operations were consolidated to the Loveland Colorado location.

16. The College offers a Master of Business Administration program.  The College's 45-credit hour Master of Business Administration (MBA) program is designed to teach graduates the skills to succeed as well-rounded business professionals. Students take foundational courses on business research and strategy, core business courses centered on traditional operating

models, and supply chain focused courses.  The program culminates in a research thesis that allows the student to do a deep exploration of a topic of interest that is academically relevant to the field.  The College's MBA prepares students to fill business leadership roles as managers in large corporate environments. For entrepreneurs, the MBA provides the necessary business acumen for successful and innovative business operations including building and leveraging supply chains for competitive advantages.  One of the distinguishing characteristics of the College is that it offers this program for a very reasonable tuition of only $4500, ($100 per credit hour), a tuition that is substantially less than that charged for comparable programs in the vast majority of accredited schools.  For instance, upon information and belief, a comparable DEAC accredited Colorado school called American Sentinel University charges tuition for a 36 credit hours MBA program at $515 per credit hour for a tuition of more than $18,000.

17.  For a postsecondary educational institution to be eligible to participate in the Title IV Programs, it must be accredited by an accrediting agency recognized by the Department of Education.   See 20 U.S.C. § 1002 (A)(1)(a) &(B)(1)(d); 34 C.F.R. § 600.5(6).

## COUNT 1

## DENIAL OF DUE PROCESS AND FAILURE TO

## APPLY DEAC STANDARDS

18.  The Plaintiff restates and incorporates by reference each and every paragraph and each of the allegations set forth above as though fully set forth.

19.  To receive and retain accreditation, the College has complied with DEAC's rules as described in their *Accreditation Handbook*.  The *Accreditation Handbook* which sets forth the standards of accreditation is a manual published by DEAC setting for the requirements of accreditation and by which member schools agree to be bound and which DEAC agrees to apply impartially

to all member schools.  It sets forth the procedure for putting schools on notice when accreditation issues arise.  For instance, the handbook requires that in the event that accreditors detect problems, they must defer any decision until the discrepancies between the accreditors' finding and the response of the school can be reconciled.  As a requirement to meet 34 C.F.R. § 602.18(b) ensuring controls against inconsistent application of standards, and 34 C.F.R. § 602.18(d) having a reasonable basis for determining that the information the agency relies on for making accrediting decisions is accurate, the standard practice is to defer any negative findings until such time as a new and different team of accreditors visit the school several months later.  If the second team detects problems, the accrediting commission will then, and only then, issue a public "show cause" letter which in effect puts the school on notice that its accreditation is in peril.  DEAC skipped these steps and issued a public "show cause" letter against the College with no attempt to follow the standard protocol, and in doing so violated the stated federal laws and regulations.  DEAC did not provide the College with any time to address the myriad of alleged defects they claimed to find in their fraudulent report.  One of the central causes of action in this case is based on DEAC issuance and publication of a public "show cause" letter which had no basis in fact and was issued without DEAC following any of its clearly established protocol governing the issuance of such letters, causing great harm to the College.  The letter effectively puts the College on notice that it is about to lose its accreditation. The publication of the show cause letter effectively put the world on notice of the same.  There was no legal or factual basis for the issuance of the show cause letter, nor did DEAC follow federal requirements, or its own established protocol which it was contractually required to follow, thus causing great harm to the College.  By issuing public action with no warning, and simultaneously stating in the public action that to proceed the

school must start over as a new school and new applicant, DEAC placed the College in an

impossible and unprecedented situation. No school could survive this level of false scrutiny.

20. The US Department of Education sets forth a clear protocol for issuing "show cause" letters

by accrediting commissions. This protocol was intentionally and  completely ignored by

DEAC. The Department of Education requires that accrediting commissions have written

specification of requirements for accreditation that include clear standards for an institution

to be accredited, as well as effective controls against the inconsistent application of the

commission's standards.  The Department of Education requires all decisions regarding

accreditation to adhere to the accrediting commission's published standards, and have a

reasonable basis for determining that the information the commission relies upon for making

accrediting decisions is accurate.  DEAC violated each and every one of these standards in its

farcical review of the College and its issuance of the show cause letter.

21. DEAC relied wholly and with no further investigation upon data collected concerning the

College from a visiting team of substantially unqualified individuals in a site visit in September

of 2016.  The on-site review Chair was a person named Susan Chiarmonte.  Her highest

credential was that she attended a non-ABA accredited law school.   She has no relevant

experience in non-profit business schools.  Prior to the visit, and in contravention of accepted

protocol, she withheld her client consulting list to prevent a conflict of interest review prior

to the visit. The on-site business standards reviewer was a person named Andy Thompson.

Mr. Thompson is currently a graduate student pursuing a degree in Divinity and holds no

advanced degree or any academic credential to qualify as an accreditation business reviewer of

a graduate school. The on-site education standards reviewer was a person named Juan

Henriquez. He holds a bachelors and masters in electrical engineering, which in no way

qualifies him as an accreditation education standards reviewer at any level. The report

produced by this group was replete with inaccuracies, false data, and in some places utter fabrications and lies.

22. Additionally, 34 C.F.R. 602.20 sets forth the protocol for the enforcement of standards and requires in sum that if an accrediting commission's review of an institution under any standard indicates that the institution is not in compliance with that standard, it must follow published standards and practices.

23. Loss of accreditation, or even the public threat thereof, means that the College will be ineligible to qualify for Title IV funding.  While the College did not participate in the Title IV program at the time of its review by DEAC, Title IV is an important component for any future planning by an educational institution.  This would result in a substantial loss of revenue in the future. Loss of accreditation also means that students in general will not choose the College as their school.  This obviously will result in a loss of revenue.  Indeed, the loss of revenue may be severe enough to force the College to close.  Such a closure would disrupt the education and careers of the students in the school, as well as cause grave financial harm to the employees of the school, its faculty and staff.

24. Loss of accreditation, or the perception that such loss of accreditation is imminent, as caused by the public show cause letter published by DEAC on its website, makes it impossible for the College to recruit new students, new faculty and new staff.  In short, the publication of the unwarranted public show cause letter caused irreparable harm to the College, and was without basis in fact or law.

25. The U.S. Department of Education requires that accrediting commissions show consistency in decision making.  DEAC is demonstrably wildly inconsistent in its decision making with respect to matters of accreditation, awarding accreditation to schools with very poor records of student retention and other criteria, while punishing the College that had a superior record

with respect to these important criteria upon which accreditation decisions are supposed to be based.  DEAC's decisions regarding accreditation of various schools are are politically-based, with no reference to the integrity, financial or educational quality or student results  of the schools being considered for re-accreditation.  In short, DEAC's accreditation processes have been farcical and fraudulent.

26.   The College seeks damages for the harm caused by DEAC's fundamental violation of its rules, the U.S. Department of Education's requirements, its contract with the College.

27.   DEAC issued a public "Show Cause Order" on February 27, 2017.

28.  The public Show Cause Order was replete with grossly inaccurate information and falsehoods and DEAC made no attempts to verify any of the information contained wherein prior to public publication.

29.  Ostensibly, the public Show Cause Order was a critique of various aspects of the College.  The practical effect was to devastate the standing of the College as set forth above.

30.  DEAC did not have a factual basis for the issuing the public Show Cause Order but did so for selfish political purposes.

31.  As a direct and proximate result of the denial of due process by DEAC, and the failure of DEAC to apply its own standards to its review of the College,  the College has incurred damages and will continue to incur substantial damages including, among other things, loss of future Title IV funding, damage to its reputation, loss of goodwill, loss of students and concomitant tuition revenue, loss of investors, loss of donors and the potential loss of its entire business with monetary damages of at least Seventeen Million, Four Hundred Thousand ($17,400,000) dollars.

**COUNT II**

**BREACH OF CONTRACT**

32.  The Plaintiff restates and incorporates by reference each and every paragraph and each of the allegations set forth above as though fully set forth.

33. Both parties agreed to be bound by DEAC's Standards of Accreditation as set forth in its handbook, as a formal contract, which governs both conduct by the school and conduct by DEAC in its accreditation reviews.

34. When the College applied to receive accreditation in 2000, and DEAC granted accreditation to the College in 2001, which such accreditation was subsequently extended for multiple-year intervals, the College and DEAC formed a valid contract.

35. The College, as part of its contractual obligations, paid annual dues to DEAC.  The College substantially complied with its obligations under the contract.

36. DEAC's contract with the College included an implied duty of good faith and dealing.

37. DEAC materially breached the contract by, among other things, refusing to apply its standards of accreditation to the school in a fair and impartial manner.  Specifically, DEAC issued a public show cause letter which was based upon unverified false data and was replete with defamatory falsehoods against the College.

38. Some of the false information contained in the Show Cause Order were:

   a)  DEAC addressed the College as "William Loveland University" twice in the show cause letter to manipulate the school's name to make changes at the school seem more impactful than they actually were (Exhibit A - PARA II.37.a - DEAC Show Cause Letter to WLC.pdf).

   b)  DEAC claimed that the College's MBA program was approved by them in 2015 when in fact they issued a signed approval letter in 2013, to plant false information in official reports to slant data to support their politically motivated outcomes. (Exhibit B - PARA II.37.b - 2013 December DETC MBA Approval.pdf)

c)   DEAC claimed the College's 501c3 tax status change took place in 2015 when in fact DEAC approved the change in 2014 and the IRS issuance has an effective date of 2014, to plant false information in official reports to slant data to support their politically motivated outcomes. (Exhibit C - PARA II.37.c - 2014 July DETC Name and Tax Status Approval.pdf, Exhibit D - PARA II.37.c - 2016 August IRS 501c3 Approval 1.pdf, Exhibit E - PARA II.37.c - 2016 August IRS 501c3 Approval 2.pdf)

d)   DEAC withheld exculpatory evidence in their possession during the show cause review that demonstrated the State of Colorado was notified of the schools upcoming change in 2012 and that DEAC had issued a signed letter offering their full support for the changes in 2013 (Exhibit F - PARA II.37.d - 2012 October CDHE Notification.pdf, Exhibit G - PARA II.37.d - 2013 March DETC Full Support for Substantive Change Notification.pdf)

e)   DEAC withheld exculpatory evidence in their possession during the show cause review that demonstrated the College had the MBA program reviewed and approved by the Colorado Department of Education in 2013 (Exhibit H - PARA II.37.e - 2013 CDHE State Approval.pdf).

f)   DEAC withheld exculpatory evidence in their possession during the show cause review that demonstrated the College's MBA program meets DEAC standards per their signed review in 2013 (Exhibit I - PARA II.37.f - 2013 November MBA Meets Standards DETC Notification.pdf).

g)   DEAC withheld exculpatory evidence in their possession during the show cause review that demonstrated the College had successfully undergone a substantive change on-site visit by DEAC in 2015 (Exhibit J - PARA II.37.g - 2015 July DEAC Substantive Change Approval.pdf).

h)   DEAC withheld exculpatory evidence in their possession during the show cause review that demonstrated the College had coordinated with local city leadership concerning having a school in the city named after the city patriarch (Exhibit K - PARA II.37.h - 2014 March City of Loveland Response to College Notification.pdf).

i)   DEAC withheld exculpatory evidence in their possession during the show cause review that demonstrated the College had its logistics courses teach-out plan approved by signed DEAC letter that stated "the teach-out plan complies with the non-substantive change process set forth in the 2016 DEAC Accreditation Handbook, Processes and Procedures, XIV. G. The Commission voted to accept the teach-out plan." (Exhibit L - PARA II.37.i - 2016 June DEAC Non Substantive Change Approval for Teachout.pdf).

j)   DEAC claims on its website that they notified the College of the show cause action on January 29, 2016 when in fact they notified the College on February 27, 2017, to plant false public information to slant data to support their politically motivated outcomes (Exhibit M - PARA II.37.j - May 13 2017 False Show Cause Date Still On DEAC Website.png).

39. Some of the unverified false information contained in the site visit report that the public Show Cause Order relied upon and/or referenced were:

a)   The report criticized the Mission Statement of the College.  However, the narrative for the Mission Statement was taken directly from DEAC's prior report, dated which approved the Mission Statement.

b)   The site visit report claimed in its Show Cause Order that the College did not provide "key indicators" with which to measure the College's mission.  In fact, the College provided those key indicators in an exhibit submitted to the DEAC as part of the self-study.  The DEAC's claim to the contrary was a lie.

c) The site visit report claimed that the College did not have a student database.  In fact, the College does have a student database and provided evidence of it to DEAC, which it ignored.  DEAC's claim of a missing student database was a lie.

d) The site visit report claimed that the College's computer systems do not secure transmissions of data.  In fact the College's computer systems are secure and the College provided evidence of such security to the DEAC.  DEAC's claim that the computer systems were insecure was a lie.

e) The site visit report claimed that the College does not have a fire-proof safe.  In fact the College has a fire-proof safe; the visiting team from DEAC observed the safe in the College's office and in fact had to walk around it multiple times.  DEAC's claim that the College does not have a fire-proof safe was a lie.

f) The site visit report claimed that the College does not have a student data protection policy.  The College does in fact have a student data protection policy and provided evidence of same to DEAC.  DEAC's claim that the College does not have a student data protection policy was a lie.

g) The site visit report claimed that the College did not include required checklist forms in its self-study prepared in contemplation of the re-accreditation visit.  In fact, the College did provide the required checklist forms to the DEAC, attached as an exhibit.  DEAC's claim that the College did not include required checklist forms was a lie.

h) The site visit report claimed that the College failed to disclose to DEAC that its degree was a 100% online program.  In fact, the College did disclose same, in a plain and straightforward manner to DEAC.  The description of the degree being 100% online is set forth in bold 16-point type on the College's home page of its website.  It is impossible that DEAC could have accidentally missed this information, and given DEAC's charter to

accredit distance education institutions this is a bizarre claim at that.  DEAC's claim that the College failed to disclose that its degree could be earned 100% online was a lie.

i)  The site visit report claimed that the College failed to disclose its physical address on its website.  In fact, there is a link to the address on each and every page of the College's website, and same was provided to DEAC in response to their absurd claim.  DEAC's claim that the College failed to disclose its physical address on its website was a lie.

j)  The site visit report claimed that the College failed to follow DEAC ethics requirements by requiring staff to sign ethics agreements.  In fact, the College requires its staff to sign ethics agreements and provided said agreements signed by staff members Devin Presley, Jennifer Kievit and April Lindgre.  DEAC's claim that the College failed to have staff to sign ethics agreements was a lie.

k)  The site visit report claimed that the College hired student recruiters over which the College has no control.  In fact, the College did not hire student recruiters and never represented to DEAC that they did.  DEAC's claim that the College hires student recruiters was a lie.

l)  The site visit report claimed that the staff at the College did not have bachelor's degrees.  The staff in question did in fact have bachelor's degrees, though having such a degree is not a requirement of DEAC in any event.  The College provided copies of the bachelor's degrees to DEAC which they ignored.   DEAC's claim that College staff did not have bachelor's degrees was a lie.

m)  The site visit report claimed that the College does not permit students to cancel classes "in any manner."  In fact, the College does permit student to cancel classes by writing, voice, phone, email, or in any other reasonable manner of communication.  The College advised

DEAC of this.  DEAC's claim that the College does not permit students to cancel classes "in any manner" was a lie.

n) The site visit report claimed that they discovered a "secret billing contract" that the College forced students to sign that required secret monthly payments.  DEAC further claimed that the College employed "aggressive" collection pressure on students in order to collect tuition from them.  This bizarre claim has no basis in fact.  DEAC's claim that the College makes use of a secret billing contract and puts unusual pressure on students to pay tuition was a lie, and a strange one at that.

o) The site visit report claimed that the College did not provide financial statements to them as part of the review process.  In fact, the College did provide financial statements.  It was included as an exhibit to the self-study submitted by the College to the DEAC.  It is almost inconceivable that the DEAC personnel reviewing the self-study did not see that financial statements were attached.   DEAC's claim that the College did not submit financial statements to them was a lie.

p) The site visit report claimed that an insignificant discrepancy between a management report and a CPA review of financials (which earlier they claimed was not provided) was a major issue that warranted severe action.  DEAC's claim that the discrepancy was a major issue was a lie.

q) The site visit report claimed that there was no evidence of support for the College by the Board of Directors, yet there were two board members present on-site for the entire duration of the review, and further they spoke to a third board member during their site visit by teleconference.  DEAC's claim that there was no board support was a lie.

r)   The site visit report claimed that the College did not have a lease for its office space, but in fact the College has a written lease and provided a copy of it to DEAC.  DEAC's claim that there was no lease was a lie.

s)   The site visit report claimed that the College did not review its strategic plan annually. In fact, the College provided board minutes that proved it reviewed its strategic plan annually which DEAC ignored.  DEAC's claim that the College did not review its strategic plan annually was a lie.

t)   The site visit report claimed that the College MBA program did not have program goals. In fact, the College provided the program goals in an exhibit to the SER which DEAC ignored, and they are also clearly posted on the Colleges public website.  DEAC's claim that the College MBA program did not have outcome goals was a lie.

u)   The site visit report claimed that the College MBA program goals (that they prior claimed the College did not have) did not follow Bloom's Taxonomy (an industry standard set of verbs). In fact, the College provided the program goals in an exhibit that did follow Bloom's Taxonomy, including a detailed explanation of how, which DEAC ignored. DEAC's claim that the College MBA program did not have outcome goals following Bloom's Taxonomy was a lie.

v)   The site visit report claimed that the College did not provide a comparison between its MBA program and similar MBA programs. In fact, the College provided the requested comparison in the SER which DEAC ignored.  DEAC's claim that the College did not provide a comparison between its MBA program and similar MBA programs was a lie.

w)   The site visit report claimed that the College did not provide a course development handbook for review. In fact, the College provided the requested thirty-one-page

handbook which DEAC ignored.  DEAC's claim that the College did not provide a course development handbook for review was a lie.

x)  The site visit report claimed that the College did not provide industry research supporting the structure of the MBA program. In fact, the College provided the requested forty-seven-page research summary which DEAC ignored.  DEAC's claim that the College did not provide industry research supporting the structure of the MBA program was a lie, and another strange lie as DEAC approved the MBA program in writing by signed letter.

y)  The site visit report claimed that the College did not provide course rubrics for MBA courses. In fact, the College provides rubrics, and provided DEAC samples of four course rubrics which DEAC ignored.  DEAC's claim that the College did not provide course rubrics for MBA courses was a lie.

z)  The site visit report claimed that the College did not provide credentials for its Chief Academic Officer (CAO). In fact, the College provided over twenty pages of credentials, a detailed six-page CV, an index of twenty-five peer review articles written by the CAO, and the transcript of the CAO's PhD. in Educational Psychology from the University of Minnesota. Additionally, the College made the CAO available in person for interviews. DEAC's claim that the College did not provide credentials for its Chief Academic Officer was a lie.

aa) The site visit report claimed that the College did not provide evidence of faculty in-service training by their CAO. In fact, the College provided training outlines and signed training completion forms which DEAC ignored.  DEAC's claim that the College did not provide evidence of faculty in-service training by their CAO was a lie.

bb) The site visit report claimed that the College did not provide sample refund calculations. In fact, the College provided three-pages of sample calculations that DEAC ignored. DEAC's claim that the College did not provide sample refund calculations was a lie.

cc) The site visit report claimed that in offering scholarships to US military veterans associated with The Wounded Warrior Project, that the College was offering discounts to "an exceptionally broad and diverse group" which did not meet DEAC's discount criteria. In fact, the College provided a detailed process flow and evaluative criteria for scholarships that DEAC ignored. DEAC's claim that the College scholarships did not meet DEAC's discount criteria was a lie.

dd) The site visit report claimed that the College did not provide a written succession plan. In fact, the College provided a detailed succession plan that DEAC ignored. DEAC's claim that the College did not provide a written succession plan was a lie.

ee) The site visit report claimed that the College did not provide two years of financial budget forecasts. In fact, the College provided two years of financial budget forecasts along with signed board meeting minutes ratifying the budgets that DEAC ignored. DEAC's claim that the College did not provide two years of financial budgets was a lie.

ff) The site visit report claimed that the College uses a third-party book keeping service. The College does not use a third-party service. DEAC's claim that the College uses a third-party book keeping service was a lie.

40. Upon written notification by email on March 9, 2017 and March 19, 2017 by the College to the DEAC Executive Director, Leah Matthews, identifying the false information outlined in this complaint and that was signed into public record by her on February 27, 2017, Ms. Matthews in return email on March 21, 2017 threatened the College, notified the College that she would "recused" herself from any attempted factfinding or goodwill to work with the

College to correct the false information, and instead notified the College that retained DEAC

lawyers, on an unspecified timeline, would be the schools primary point of contact. (Exhibit

N - PARA II.39 - DEAC eMail Chain Ending in Threat and Recusement.pdf).

41. In short, DEAC fabricated false claims against the College in order to have a pretext to issue

a public Show Cause Order.  DEAC did this for its own selfish political purposes.  Given the

pressure placed on accrediting agencies due to abuse in the for-profit education industry,

DEAC was under pressure, it thought, to demonstrate that it was "cracking down" on a

school.  DEAC targeted the College in response to what it perceived to be external pressure

given that DEAC is undergoing its own review from the Department of Education.   Upon

information and belief, DEAC's charter is coming up for review before the Department of

Education in the near future.   DEAC felt it needed to demonstrate a toughness but instead

of taking action against larger schools which provide greater income to DEAC, it selected a

school who's DEAC dues were only modestly profitable for DEAC against which to take

action, though there was no basis whatsoever for the negative action taken by DEAC.

42. DEAC accredits other schools which have substantially greater problems…low student

retention, great student debt, very poor student outcomes, all of which can be documented

and which are known to the industry and have been the subject of published scholarly articles,

and for which DEAC has come under criticism.  The schools with poor student outcomes,

upon information and belief, provide substantial income to DEAC which collects yearly dues

based in part on the size of the school and its revenues.  Rather than issue show cause letters

or refuse to re-accredit lucrative schools with serious problems, DEAC selected a school that

provides less income to DEAC that had no actual instances of non-compliance upon which

to demonstrate that it does take actions against schools, but while selfishly protecting DEAC

operating income.

*43.* DEAC's actions in this regard were cynical, manipulative, arbitrary and capricious and they have caused a great deal of damage to the College as set forth above.

*44.* As a direct and proximate result of these material breaches of the contract, the College has incurred damages and will continue to incur substantial damages including, among other things, loss of future Title IV funding, damage to its reputation, loss of goodwill, loss of students and concomitant tuition revenue, loss of investors, loss of donors and the potential loss of its entire business with monetary damages of at least Seventeen Million, Four Hundred Thousand ($17,400,000) dollars.

## COUNT III

## DEFAMATION

**45.**   The Plaintiff restates and incorporates by reference each and every paragraph and each of the allegations set forth above as though fully set forth.

46. The actions of the DEAC in publishing its false and defamatory public Show Cause letter on its website constitute defamation of the plaintiff.

47. As a direct and proximate result of the defamation by DEAC of the College, the College has incurred damages and will continue to incur damages to its reputation, loss of good will and other injuries, with monetary damages of at least Seventeen Million, Four Hundred Thousand ($17,400,000) Dollars.

## COUNT IV

## TORTIOUS INTERFERENCE WITH PROSPECTIVE

## BUSINESS OR ECONOMIC ADVANTAGE

48.  The Plaintiff restates and incorporates by reference each and every paragraph and each of the allegations set forth above as though fully set forth.

49.  DEAC knew, or should have known, that by issuing its fraudulent public Show Cause Letter, it would materially impact the current and future prospects of the College by inhibiting student enrollment, revenue collection, staff recruitment, and donations.  In issuing its public Show Cause Letter, DEAC intended to prevent the College from offering prospective student the opportunity to enroll in an accredited college which offers the chance to earn and Masters Degree for a very modest tuition cost.  DEAC's Show Cause letter has caused and will cause future students not to enroll and has caused and will cause future donors to not donate.  It will cause future investors to not invest.  It will cause future students to be ineligible for student aid.  It will cause a drastic loss of revenue for the College.

50.  As a direct and proximate result of DEAC's willful and intentional interference with contractual relationships with DEAC knew about, the College has incurred damages and will continue to incur substantial damages including, among other things, a loss of current and future students with their concomitant tuition payments, a loss of future Title IV eligibility and funding, damage to the reputation of the College, loss of goodwill, and the potential loss of the College's entire business with damages in the amount of at least  Seventeen Million, Four Hundred Thousand, ($17, 400,000)  dollars.

## COUNT V

## NEGLIGENCE

### (in the alternative

### to Breach of Contract)

51.  The Plaintiff restates and incorporates by reference each and every paragraph and each of the allegations set forth above as though fully set forth.

52.  The College placed its trust and confidence in DEAC in its accrediting agency and depended on DEAC to discharge its duties to provide fair and unbiased accreditation services, assessments and rulings to and about the College.

53. DEAC has a legal duty to fairly and properly consider the College's application for re-accreditation and to act with respect to public actions including show cause letters in a fair and reasonable manner.

54. DEAC materially breached its duties when it permitted its site-visiting team and relied on the phony, fraudulent and defamatory fact finding of the aforesaid visiting team.

55. DEAC's issuance of a public show cause letter and the other acts set forth herein breached DEAC's duties owed to the College because DEAC in committing those actions did not discharge its duty to provide fair and unbiased accreditation services to the College and was not fair and reasonable to the College.

56. As a direct and proximate breach of those breaches by DEAC of its legal duties owed to the College, the College has incurred damages and will continue to incur damages of a substantial nature and amount including, among other things, a loss of future Title IV eligibility, damage to its reputation, loss of students and concomitant tuition payments, loss of goodwill, loss of investors, loss of donors and the potential loss of its entire business with damages in the amount of not less than Seventeen Million, Four Hundred Thousand ($17,400,000) dollars.

## DEMAND FOR RELIEF

WHEREFORE, Plaintiff William Loveland College respectfully requests that the Court enter judgment in its favor on its claims providing relief as follows:

1)   Entering a preliminary injunction against DEAC requiring DEAC to, among other things, rescind its Show Cause letter, or, in the alternative, to remove it from its website

and to cease and desist from further publication of same and to provide notice to the U.S. Department of Education, The Colorado Department of Education, and all other relevant parties that DEAC has rescinded or removed from publication the Show Cause letter pending the outcome of this litigation;

2) Entering a permanent injunction requiring DEAC to follow all lawful procedures set forth in its Standards of Accreditation protocol and those required by the federal regulations and federal common law due process;

3) Awarding the College damages in the amounts set forth herein or to be determined at trial, including compensatory and consequential damages including reasonable attorneys' fees, and pre-judgment and post-judgment interest, and costs,

4) Awarding the College punitive damages for DEAC's wanton and willful conduct as described herein;

5) Granting such further relief which to the Court may appear just and equitable.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff hereby demands trial by jury of all claims for money damages and issues of fact that are so triable.

Dated:  May 8, 2017

Respectfully submitted by:

s/Michael A. Koplen
Attorney for Plaintiff William Loveland College
14 South Main Street
New City, New York 10956

845-623-7070
845-215-0144 (fax)
atty@KoplenLawFirm.com
MAK3316