# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
)
WILLIAM LOVELAND COLLEGE,      )
                             )
         Plaintiff,      )
                             )
       v.          )     Civil Action No. 17-2037 (ABJ)
                             )
DISTANCE EDUCATION       )
ACCREDITION COMMISSION,    )
                             )
         Defendant.    )
_____)

## MEMORANDUM OPINION

Plaintiff William Loveland College ("WLC" or "the College") has brought this lawsuit against defendant Distance Education Accrediting Commission ("DEAC," "the agency," or "the Commission").[1] DEAC is authorized by the United States Department of Education to accredit institutions that offer distance or online post-secondary degree programs. The College received accreditation from DEAC in 2001 to offer online education to students.

In February 2017, DEAC issued a Show Cause Directive informing the College that it had concerns about the institution's ability to comply with DEAC's accreditation standards and policies, and ordering it to show cause why its accreditation should not be withdrawn. WLC's accreditation remained in effect in the interim, but it was directed to take corrective action in order

---

1      In its motion, defendant points out that the verified complaint incorrectly names defendant as the "Distance Education Accreditation Commission." DEAC's Mem. of Law. in Supp. of Mot. to Dismiss [Dkt. # 25-2] ("Def.'s Mem.") at 1 n.1; *see* Compl. [Dkt. # 2] ¶ 1. Further, while defendant does business as Distance Education Accrediting Commission, its official title is Distance Education and Training Council. Def.'s Mem. at 1.

to vacate the order, and it was required to file a new application for accreditation within thirty days.

The College then brought this lawsuit in federal court alleging five causes of action: denial of due process (Count I); breach of contract (Count II); defamation (Count III); tortious interference with prospective business or economic advantage (Count IV); and negligence (Count V).[2] *See* Compl. ¶¶ 18–50. Because the College did not attempt to invoke the procedures or address any of the concerns outlined in the Show Cause Directive, its accreditation eventually lapsed.[3]

Pending before the Court is DEAC's motion to dismiss. *See* Notice of DEAC's Mot. to Dismiss [Dkt. # 25-1] ("Def.'s Mot."); DEAC's Mem. of Law in Supp. of Def.'s Mot. [Dkt. # 25-2] ("Def.'s Mem.").[4] Because the College failed to exhaust its administrative remedies before bringing the due process claim, and because none of the state law counts states a claim upon which relief can be granted, the Court will grant defendant's motion.

---

2      The case was originally filed in the United States District Court for the Southern District of New York, but it was transferred to this Court on October 2, 2017. *See* Order [Dkt. # 19].

3      In its reply brief, defendant asserts that WLC's accreditation lapsed. *See* DEAC's Reply Mem. in Supp. of Def.'s Mot. to Dismiss [Dkt. # 29] ("Def.'s Reply") at 7 n.8. Further, that information is provided on DEAC's website, *see Voluntary Withdrawal from DEAC Accreditation*, Distance Educ. Accrediting Comm'n, https://www.deac.org/Public-Notices/Voluntary-Withdrawal-From-DEAC-Accreditation.aspx (last visited Sept. 21, 2018), and the Court may take judicial notice of such information. *See EEOC v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997) (holding that, on a motion to dismiss, the Court can consider facts about which the Court can take judicial notice); *Cannon v. District of Columbia*, 717 F.3d 200, 205 n.2 (D.C. Cir. 2013) (taking judicial notice of document posted on the District of Columbia's Retirement Board website); *Pharm. Research & Mfrs. of Am. v. Dep't of Health & Human Servs.*, 43 F. Supp. 3d 28, 33 (D.D.C. 2014) (taking judicial notice of information posted on official public websites of government agencies).

4      The motion has been fully briefed. *See* Mem. in Opp. to Def.'s Mot. [Dkt. # 28] ("Pl.'s Opp."); Def.'s Reply.

**BACKGROUND**

Plaintiff is a not-for-profit degree-granting institution located in Loveland, Colorado, Compl. ¶¶ 1, 9. The College's original mission was to provide training in the emerging field of traffic management, but in 1996, it transitioned "to a distance based education model to leverage emerging technological opportunities" in education markets. *Id.* ¶ 9. Distance education or distance-based education is also commonly referred to as online education. *See id.* ¶ 10.

Defendant is a private, not-for-profit organization that operates as an institutional accreditor of distance education institutions. Compl. ¶ 10; *see* Distance Educ. Accrediting Comm'n, http://www.deac.org (last visited Sept. 5, 2018). It was first recognized by the United States Department of Education in 1959, and it continues to be an accreditor of "postsecondary institutions in the United States that offer degree and/or non-degree programs primarily by the distance or correspondence education method up to and including the professional doctoral degree." Compl. ¶ 14; *Accreditation in the United States*, U.S. Dep't of Educ., https://www2.ed.gov/admins/finaid/accred/accreditation_pg6.html (last visited Sept. 26, 2018).

**I.       Accreditation Procedures**

DEAC must comply with the Higher Education Act ("HEA"), 20 U.S.C. § 1001 *et seq.*, the statute governing accrediting agencies, as well as Department of Education regulations. This framework requires each accrediting agency to maintain and make available to the public: written materials describing the accreditation process; the procedures institutions must follow to apply; the standards used to make accreditation decisions; the institutions and programs the agency currently accredits; and information about members of the agency's decision-making bodies and principal administrative staff. 20 U.S.C. § 1099b; 34 C.F.R. § 602.23(a). The agency must afford certain due process protections to each educational institution it accredits, which include, among other things, providing written statements of agency requirements and standards, written notice of

any "adverse accrediting action or action to place the institution or program on probation or show cause," and an opportunity to appeal any adverse action prior to the action becoming final. 20 U.S.C. § 1099b(a)(6); 34 C.F.R. § 602.25. The accrediting agency must also have procedures in place for providing written notice about certain accrediting decisions to the public, the Secretary of Education, and the appropriate State licensing or authorizing agency. 20 U.S.C. § 1099b(a)(7)–(8); 34 C.F.R. § 602.26.

To be accredited by DEAC, an institution has the burden of proving that it is in compliance with all of the standards set out in the agency's accreditation handbook. *See* Compl. ¶ 19; Decl. of Joshua N. Ruby in Supp. of DEAC's Mot., Ex. C to Def.'s Mot. [Dkt. # 25-3] ("Ruby Decl."); DEAC Accreditation Handbook, Ex. 1 to Ruby Decl. [Dkt. # 25-3] ("Handbook").[5] The Handbook is a manual published by DEAC that sets forth the requirements of accreditation, and member schools agree to be bound by those standards if they receive accreditation. Compl. ¶¶ 19, 33.

The application process includes a self-evaluation by the applicant, a curricular review by DEAC-engaged subject matter specialists with an opportunity for the institution to respond, and an on-site evaluation of the institution's compliance with DEAC accreditation standards. Handbook at 12–20. Following the on-site evaluation, the Chair of the on-site team prepares a report, and the institution has thirty-days to submit a response. *Id.* at 19.

The Commission usually meets twice a year, in January and June, to review applications for initial accreditation or renewal of accreditation. Handbook at 20. After reviewing all submitted

---

5       The Handbook was attached to defendant's motion to dismiss, not the complaint. But because it is publicly available on DEAC's website, *see The DEAC Accreditation Handbook*, Distance Educ. Accrediting Comm'n, https://www.deac.org/Seeking-Accreditation/The-DEAC-Accrediting-Handbook.aspx (last visited Sept. 5, 2018), and because it is incorporated by reference in the complaint, the Court may consider it when evaluating defendant's motion to dismiss. *See St. Francis Xavier Parochial Sch.*, 117 F.3d at 624–25; *Cannon*, 717 F.3d at 205 n.2.

materials, the Commission may take one of four courses of action: (1) accredit a new applicant institution for up to three years, or continue an institution's accredited status for up to five years; (2) defer a decision pending receipt of a Progress Report, submission of additional information, and/or the results of a follow-up-on-site evaluation; (3) direct the institution to Show Cause as to why its accreditation should not be withdrawn; or (4) deny accreditation to an applicant or withdraw accreditation from an accredited institution. *Id.* at 20–23.

Of particular relevance to this case are the steps DEAC and the institution must take if the Commission decides to issue a Show Cause Directive to an institution. "In cases where the Commission has reason to believe that an institution is not in compliance with accreditation standards and other requirements, the Commission may direct the institution to Show Cause as to why its accreditation should not be withdrawn." Handbook at 21. An institution must receive written notice of a Show Cause Directive, and the notice must: (1) state the reasons why the directive was issued; (2) identify the standards or accreditation requirements for which compliance is a concern; (3) recite the reasons for and the evidence supporting the claim that the institution may not be in compliance with accreditation requirements; and (4) advise the institution of its obligations under the directive and of the deadline for its response. *Id.* at 22.

When an institution receives a Show Cause Directive, it is "required to demonstrate corrective action and compliance with accrediting standards or procedures." Handbook at 21. The "burden of proof rests with the institution to demonstrate that it is meeting DEAC's accreditation standards." *Id.* Once the time for an institution to respond or comply with the requirements in the directive has expired, the Commission may do one of four things: (1) vacate the Show Cause Directive if the response demonstrates that removal of the order is warranted or that the institution is in compliance with the cited accreditation standards and requirements; (2) continue the Show

Cause Directive, pending the receipt of additional information or further institutional reports; (3) order a special visit to the institution; or (4) withdraw the institution's accreditation, an action "that would be subject to an appeal by the institution." *Id.* at 22. The Commission must notify the institution of its decision within thirty days, and in all cases, the Commission must "allow the institution sufficient time to respond to any findings before making any final decision regarding the institution's accredited status." *Id.* at 23.

If the Commission decides to deny or withdraw accreditation, the institution has the right to appeal that decision by submitting an Application for Appeal to the Executive Director of the Commission. Handbook at 23–24. The institution must appeal within ten days of receipt of the letter advising it of the denial or withdrawal of accreditation, or the right to appeal will be deemed waived and the "Commission's action [will] become final." *Id.* The institutional appeal "is heard by an independent appeals panel that is separate from the Commission and serves as an additional level of due process for the institution." *Id.* at 24. The panel may affirm, remand, amend, or reverse the Commission's decision. *Id.* at 25–26.

"Upon being notified that its appeal did not change an adverse Commission decision, an institution has five business days to request arbitration, during which no public notification of the Commission action will be made." Handbook at 27. If the institution's arbitration proceeding is unsuccessful, and the accreditation decision becomes final, the institution may file suit in the District Court for the District of Columbia. *Id.* at 150 ("An institution which seeks to overturn an adverse arbitration decision, or to file suit against the Corporation for any other reason, must bring the suit in the Federal District Court for the District of Columbia."); *see also id.* at 20 (noting that a decision becomes final only after the time for requesting an appeal has expired or the appeal itself is denied).

## II. WLC's Application to Renew Accreditation

Plaintiff received its first accreditation from DEAC in 2001.[6] Compl. ¶ 9. In the later proceedings relevant to this matter, the College filed an application to renew its accreditation,[7] *see* Pl.'s Opp. at 1, and DEAC began the process associated with reviewing the application pursuant to the Handbook's procedures.

Plaintiff alleges that in September 2016,[8] a team of individuals conducted an on-site review of the College. Compl. ¶ 21. Then, at its meeting in January 2017, DEAC determined that the College did not meet its accreditation criteria. Show Cause Directive at 1. As a result, DEAC issued a Show Cause Directive in a letter dated February 27, 2017, asking the College to "show cause why its accreditation should not be withdrawn." *Id.*; Compl. ¶ 27.

The letter informed the College that the Show Cause Directive was "not an adverse action but a statement of concern . . . about the institution's ability to document compliance with DEAC's accreditation standards and policies." Show Cause Directive at 1. It expressly stated that the "[a]ccreditation for WLC remain[ed] in effect during the period of Show Cause," *id.*, and it outlined the corrective action the College needed to take within a twelve-month period in order to vacate the order. Show Cause Directive at 1–12; *see also* Handbook at 21–23. According to the order, WLC was required to submit a new application for accreditation by March 27, 2017, and

---

[6] At the time plaintiff was accredited, the parties were known by different names. Plaintiff was known as the Institute of Logistical Management, and defendant was known as the Distance Education & Training Council. *See* Compl. ¶ 15.

[7] Neither party provides the date on which plaintiff applied to renew its accreditation.

[8] The Show Cause Directive notes the date of the on-site evaluation to have been October 28, 2016. Ex. A to Compl. [Dkt. # 2-2] ("Show Cause Directive") at 1.

the College was informed that the Commission's staff would then set up a Fall 2017 visit. Show Cause Directive at 2.

The DEAC announced the issuance of the Show Cause Directive on its website within twenty-four hours of giving notice to the College.[9] *See* Compl. ¶ 19 (alleging that the show cause letter was published); Ex M. to Compl. [Dkt. # 2-14] (screenshot of website listing William Loveland College as an institution that had received a show cause directive); *see also* Def.'s Mem. at 3; Pl.'s Opp. at 2.

WLC responded to the Show Cause Directive via email on March 9, 2017, and it disagreed with many of the concerns the Commission had identified. Compl. ¶ 40; Ex. N to Compl. [Dkt. # 2-15] ("Email Exchange"). The College undertook to provide a "clear and accurate timeline of what actually transpired" in its past in the hope that DEAC would withdraw the Show Cause Directive and grant reaccreditation. *See* Compl. ¶ 40; Email Exchange. It also requested a response from the DEAC by March 17, 2017 so that it would have enough time to file the reaccreditation paperwork by March 27, 2017. *See* Email Exchange. On March 17, 2017, the Executive Director of DEAC, Leah Matthews, responded to the College's email and explained that the Show Cause Directive was not based on previously approved changes that had taken place throughout the College's history. *See id.* She reiterated that the Commission "found that the institution did not meet accreditation standards," and that WLC's new application was due on March 27, 2017. *Id.*

---

9       Based on a review of DEAC's website, it appears that the entire Show Cause Directive is not made public. Rather, DEAC announces which institutions are "on show cause," and it provides an explanation of the accreditation standards that are subject to the show cause order. *See Institutions on Show Cause*, Distance Educ. Accrediting Comm'n, https://www.deac.org/Public-Notices/Institutions-On-Show-Cause.aspx (last visited Sept. 24, 2018).

On March 19, 2017, WLC emailed DEAC and accused the agency, and Matthews specifically, of making false statements in the Show Cause Directive. *See* Compl. ¶ 40; Email Exchange. Matthews responded by email a few days later, stating that the College had made "a very, very serious accusation." *See* Compl. ¶ 40; Email Exchange. She informed WLC that for that reason, she had been recused from the matter, and DEAC's legal counsel and members of the Executive Committee would contact the institution. *See* Compl. ¶ 40; Email Exchange. The College expressed frustration with Matthews' recusal, complaining that it had "exhausted almost every avenue giving [DEAC] all of the accurate data," and that it needed DEAC's continued cooperation so that it could meet the March 27, 2017 renewal application deadline. *See* Email Exchange.

Although the complaint provides no additional facts, WLC states in its brief that at that point, it "decided not to continue with the process," and that it filed this lawsuit instead. Pl.'s Opp. at 2; *see also* Def.'s Mem. at 5 ("Instead, without responding to the Show Cause Directive and without availing itself of its procedural rights under the Handbook, WLC filed this lawsuit . . . .").

The complaint includes five causes of action:

- Count 1 – Denial of Due Process and Failure to Apply DEAC Standards

- Count 2 – Breach of Contract

- Count 3 – Defamation

- Count 4 – Tortious Interference with Prospective Business or Economic Advantage

- Count 5 – Negligence (in alternative to Breach of Contract)

Count I alleges that by issuing a public Show Cause Directive to the College, DEAC violated federal laws and regulations, as well as its own protocols, because the "standard practice is to defer any negative findings" until another team visits the school. Compl. ¶ 19. According to

the College, DEAC violated the school's right to due process when it "skipped these steps[,] . . . [and] did not provide the College with any time to address the myriad of alleged defects [it] claimed to find." *Id.*

Count II alleges that after WLC applied and received accreditation and continued to pay annual dues to DEAC, the parties "agreed to be bound by DEAC's Standards of Accreditation as set forth in its handbook, as a formal contract." Compl. ¶¶ 33–35. According to the College, "DEAC materially breached the contract by . . . refusing to apply its standards of accreditation to the school in a fair and impartial manner," and by issuing the Show Cause Directive, "which was based upon unverified false data and was replete with defamatory falsehoods." *Id.* ¶ 37.

The College also brings a defamation claim in Count III, alleging that the Show Cause Directive was "false and defamatory," and that the publication of the directive caused the College to "incur damages to its reputation" as well as a loss of good will and other monetary damages. Compl. ¶¶ 46–47.

Count IV alleges that DEAC willfully and intentionally interfered with the College's business by issuing, and making public, the Show Cause Directive. Compl. ¶¶ 49–50. The College claims that "DEAC knew, or should have known, that by issuing its fraudulent public Show Cause Letter, it would materially impact the current and future prospects of the College by inhibiting student enrollment, revenue collection, staff recruitment, and donations." *Id.* ¶ 49.

Finally, as an alternative to the breach of contract claim, Count V alleges negligence. Compl. ¶¶ 52–56. According to the complaint, DEAC had "a legal duty to fairly and properly consider the College's application for reaccreditation," and it "breached its duties" when it "relied on the phony, fraudulent and defamatory fact finding" of its site-visiting team, and then published the Show Cause Directive. *Id.* ¶¶ 53–54.

In its prayer for relief, the College asked for a "preliminary injunction" against DEAC requiring it to rescind the Show Cause Directive and/or remove it from its website,[10] and it requested a permanent injunction requiring DEAC to follow all of the procedures set forth in its Handbook. Compl. at 26–27 (demand for relief). In addition, plaintiff asks the Court to award it compensatory, consequential, and punitive damages. *Id.*

## **STANDARD OF REVIEW**

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions." *Iqbal*, 556 U.S. at 678. And "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 679, citing *Twombly*, 550 U.S. at 556.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* A pleading must offer more than "labels and conclusions" or a "formulaic recitation of the elements of a cause of action," *id.*,

---

10     At no point did the College comply with Federal Rule of Civil Procedure 65 or Local Civil Rule 65.1 and file a proper motion for a preliminary injunction.

quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id*.

In evaluating a motion to dismiss under Rule 12(b)(6), a court must "treat the complaint's factual allegations as true and must grant plaintiff 'the benefit of all inferences that can be derived from the facts alleged.'" *Sparrow v. United Air Lines, Inc.*, 216 F.3d 1111, 1113 (D.C. Cir. 2000) (internal citation omitted), quoting *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979); *see also Am. Nat'l Ins. Co. v. FDIC*, 642 F.3d 1137, 1139 (D.C. Cir. 2011), quoting *Thomas v. Principi*, 394 F.3d 970, 972 (D.C. Cir. 2005). Therefore, when considering a motion to dismiss, a court must construe a complaint liberally in the plaintiff's favor. *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). Nevertheless, the court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the court accept plaintiff's legal conclusions. *Id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *St. Francis Xavier Parochial Sch.*, 117 F.3d at 624–25.

## ANALYSIS

### I.  The due process claim in Count I will be dismissed because WLC failed to exhausted its administrative remedies.

Plaintiff claims that DEAC failed to follow its own procedures and therefore deprived the College of due process when it issued the Show Cause Directive. Compl. ¶ 19. To the extent plaintiff's claim "sounds in a federal common law duty of certain private organizations to use adequate procedural safeguards when exercising their powers," DEAC argues that courts

reviewing such claims "apply principles of federal administrative law, including the requirement that a party seeking judicial review exhaust its available administrative remedies."[11] Def.'s Mem. at 6. DEAC maintains that "[b]ecause WLC failed to exercise the rights which DEAC's written accreditation procedure afforded it, and because WLC failed to pursue its application for renewal of its accreditation to a final decision, it failed to exhaust its administrative remedies and may not seek relief in this Court." *Id.*

The College concedes that it did not exhaust the administrative processes provided in the Handbook. Pl.'s Opp. at 2 ("Plaintiff disagreed with many of the concerns expressed in the Show Cause Directive, and decided not to continue with the process. It filed this lawsuit seeking

---

[11]     Because accreditation agencies are private entities, not state actors, they "are not subject to the strictures of constitutional due process requirements." *Prof'l Massage Training Ctr., Inc. v. Accreditation All. of Career Schs. & Colls.*, 781 F.3d 161, 169 (4th Cir. 2015). But, "like all other bureaucratic entities, [they] can run off the rails," and so they are not "wholly free of judicial oversight." *Id.* "[T]here exists a 'common law duty on the part of "quasi-public" private professional organizations or accreditation associations to employ fair procedures when making decisions affecting their members.'" *Id.*, quoting *McKeesport Hosp. v. Accreditation Council for Graduate Med. Educ.*, 24 F.3d 519, 534–35 (3d Cir. 1994); *see also Marjorie Webster Jr. Coll., Inc. v. Middle States Ass'n of Colls. & Secondary Schs., Inc.*, 432 F.2d 650, 655–58 (D.C. Cir. 1970) (recognizing that judicial power to regulate private accreditation agencies is "predicated . . . upon the developing doctrines of the common law," and that accrediting agency standards deserve "substantial deference"); *Thomas M. Cooley Law Sch. v. Am. Bar Ass'n*, 459 F.3d 705, 711–12 (6th Cir. 2006); *Chi. Sch. of Automatic Transmissions, Inc. v. Accreditation All. of Career Schs. & Colls.*, 44 F.3d 447, 449–50 (7th Cir. 1994); *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs.*, 957 F.2d 210, 214 (5th Cir. 1992); *Med. Inst. of Minn. v. Nat'l Ass'n of Trade & Tech. Schs.*, 817 F.2d 1310, 1314 (8th Cir. 1987).
            "[D]ue process claims dovetail nicely with administrative law concepts of substantial evidence and arbitrary and capricious review because the prominent point of emphasis of due process is one of procedure. When adjudicating common law due process claims against accreditation agencies, courts should 'focus primarily on whether the accrediting body's internal rules provide[d] a fair and impartial procedure and whether it [followed] its rules in reaching its decision.'" *Prof'l Massage Training Ctr.*, 781 F.3d at 172 (alterations in original), quoting *Wilfred Acad. of Hair & Beauty Culture*, 957 F.2d at 214; *see Marjorie Webster Jr. Coll.*, 432 F.2d at 655–58; *Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 961 F. Supp. 305, 313 (D.D.C. 1997) ("Decisions of [accreditation] agencies are overturned only when they are capricious or arbitrary . . . .").

injunctive relief and damages."). But it argues that "where exhaustion is not required by statute, exhaustion is a matter of judicial discretion," and the Court should excuse WLC from exhausting its administrative remedies here because doing so would have been futile: DEAC was not followings its own procedures, and it was biased. *Id.* at 3–4.

Because exhaustion was required in this case, and because the College has not adequately alleged that failure to exhaust would have been futile, defendant's motion to dismiss Count I will be granted.

### A.      The College was required to exhaust its administrative remedies.

The "exhaustion of administrative remedies is well established in the jurisprudence of administrative law," and it provides that "no one is entitled to judicial relief for a supposed or threatened injury until the prescribed administrative remedy has been exhausted." *Woodford v. Ngo*, 548 U.S. 81, 88–89 (2006), *superseded by statute* Pub. L. No. 104-134, 110 Stat. 1321 (1996), quoting *McKart v. United States*, 395 U.S. 185, 193 (1969); *Comm. of Blind Vendors v. District of Columbia*, 28 F.3d 130, 133 (D.C. Cir. 1994). This doctrine has three main purposes: it allows an agency to apply its expertise; it protects agency authority by giving the agency an opportunity to fix its own mistakes before it is brought to court; and it promotes efficiency by enabling claims to be resolved more quickly and economically in proceedings before the agency. *Comm. of Blind Vendors*, 28 F.3d at 133, citing *McKart*, 395 U.S. at 194; *see Woodford*, 548 U.S. at 89, citing *McCarthy v. Madigan*, 503 U.S. 140, 145 (1992). The D.C. Circuit has also observed that even if a court eventually reviews an agency's decision, "requiring exhaustion simplifies the court's task by providing it with a factual record developed by the agency." *Comm. of Blind Vendors*, 28 F.3d at 133, citing *McKart*, 395 U.S. at 194.

The Supreme Court has held that in cases like this one that do not involve the Administrative Procedure Act,[12] "the exhaustion doctrine continues to apply as a matter of judicial discretion." *Darby v. Cisneros*, 509 U.S. 137, 153–54 (1993); *see also Comm. of Blind Vendors*, 28 F.3d at 134 ("Because this case is not governed by the APA (or any other statute requiring exhaustion), the exhaustion doctrine applies only 'as a matter of judicial discretion.'"), quoting *Darby*, 509 U.S. at 153. "Nevertheless, even in this field of judicial discretion, appropriate deference to Congress' power to prescribe the basic procedural scheme under which a claim may be heard in a federal court requires fashioning of exhaustion principles in a manner consistent with congressional intent and any applicable statutory scheme." *McCarthy*, 503 U.S. at 144, *superseded by statute as stated in Woodford v. Ngo*, 548 U.S. 81, 85–85; *see also Free Enter. Fund v. Pub. Co. Accounting Oversight Bd.*, 561 U.S. 477, 489 (2010) ("Generally, when Congress creates procedures designed to permit agency expertise to be brought to bear on particular problems, those procedures are to be exclusive.") (internal quotation marks omitted).

"In determining whether exhaustion is required, federal courts must balance the interest of the individual in retaining prompt access to a federal judicial forum against countervailing institutional interests favoring exhaustion." *McCarthy*, 503 U.S. at 146. After reviewing the applicable statutory and regulatory scheme in this case, the Court concludes that exhaustion is required before an educational institution challenging an accreditation action brings a common law due process claim to federal court.

---

12      Neither party invokes the Administrative Procedure Act in this case, and other courts have observed that because accrediting agencies are not federal agencies, they are not governed by the APA. *See Prof'l Massage Training Ctr.*, 781 F.3d at 170; *Thomas M. Cooley Law Sch.*, 459 F.3d at 712; *Chi. Sch. of Automatic Transmissions, Inc.*, 44 F.3d at 450.

The Higher Education Act, 20 U.S.C. § 1001 *et seq*., the statute governing accrediting agencies, provides that those agencies "shall establish and apply review procedures throughout the accrediting process, including evaluation and withdrawal proceedings, which comply with due process." 20 U.S.C. § 1099b(a)(6); *see also* 34 C.F.R. § 602.25. Such procedures must provide, among other things, written notice of any deficiencies identified by the agency; an opportunity for a written response to be considered prior to final action in the evaluation and withdrawal proceedings; and the opportunity to appeal any adverse action prior to its becoming final. 20 U.S.C. § 1099b(a)(6)(A)–(C); *see also* 34 C.F.R. §§ 602.25(c)–(d), (f). The Higher Education Act also states that "any civil action brought by an institution of higher education seeking accreditation from, or accredited by, an accrediting agency . . . and involving the denial, withdrawal, or termination of accreditation of the institution of higher education, shall be brought in the appropriate United States district court." 20 U.S.C. § 1099b(f).

DEAC's Handbook sets forth the procedures it adopted to comply with the applicable statute and regulations. The Handbook details the procedural safeguards and appeal rights that institutions may invoke before a DEAC decision on an application or renewal application becomes final. For example, following an on-site evaluation and the preparation of the Chair's Report, an institution has thirty days to respond to the report, and it can add new or supporting information or correct any incorrect statements. Handbook at 19–20. If the Commission has reason to believe that an institution is not in compliance with accreditation standards, and it issues a Show Cause Directive, the institution must be afforded an opportunity to come into compliance before an adverse decision can be issued. *Id.* at 21–22. If the Commission notifies the institution of an unfavorable decision upon the expiration of the Show Cause Directive, the institution is given time to respond to any findings before the Commission may render its final decision on the institution's

accreditation status. *Id.* at 23. Finally, if the Commission decides to deny or withdraw an institution's accreditation, the institution can appeal – first to an independent appeals panel, and then to an arbitrator. *Id.* at 23–27. At that point, the district courts have exclusive jurisdiction over an institution's claims.

Although nothing in the statutory text expressly requires exhaustion, there appears to be an "unmistakable intent of Congress that the precise administrative machinery it put in place be used." *Comm. of Blind Vendors*, 28 F.3d at 134. In the Higher Education Act, Congress required accrediting agencies to establish a system of administrative remedies and to afford institutions procedural rights to guarantee that the accreditation procedure would comport with due process. Failure to require institutions to exhaust those procedures would render the provisions in 20 U.S.C. § 1099(a)(6) and 34 C.F.R. § 602.25 to be superfluous. *See Lincoln Mem'l Univ. Duncan Sch. of Law v. Am. Bar Ass'n*, No. 3:11-cv-608, 2012 WL 137851, at *7 (E.D. Tenn. Jan. 18, 2012) (concluding that "exhaustion is required before a law school complaining that it should have been awarded provisions approval may bring a civil suit in federal court" and noting that "failing to require exhaustion could easily render the provisions of 20 U.S.C. § 1099b(a)(6)(C) and 34 C.F.R. § 602.25(f) superfluous"). Further, the statute specifies that the district court will have jurisdiction to review the "denial, withdrawal, or termination of accreditation" – in other words, a final decision. *See* 20 U.S.C. § 1099b(f). This suggests that Congress did not intend that an institution would be able to "circumvent the system and seek de novo determination in federal court." *Comm. of Blind Vendors*, 28 F.3d at 135, quoting *Randolph-Sheppard Vendors v. Weinberger*, 795 F.2d 90, 103 (D.C. Cir. 1986).

The Court finds that the purposes behind the exhaustion doctrine will be furthered by requiring exhaustion in this case. Ensuring that DEAC has the opportunity to evaluate any renewed

application for accreditation and to make a decision on the Show Cause Directive based on the institution's submission would permit the agency to use its expertise and to correct any errors it may have made in issuing the Show Cause Directive in the first place. *See Comm. of Blind Vendors*, 28 F.3d at 135. And if DEAC ultimately decided to withdraw WLC's accreditation, an independent appellate panel, and potentially an independent arbitrator, could continue to review the record and fix any mistakes made along the way, and address any bias that tainted the process. By completing the administrative procedures, DEAC could potentially eliminate the need for judicial review. And if judicial review ultimately was necessary, at least the record would have been fully developed.

As the College alleges in its complaint, it accepted accreditation, and became bound by the procedures set forth in the Handbook. *See* Compl. ¶ 19. WLC's remedy was to be found within those procedures, and it failed to exhaust the avenues available to it. *See North Dakota v. N. Cent. Ass'n of Colls. & Secondary Schs.*, 99 F.2d 697, 700 (7th Cir. 1938) (upholding district court's denial of temporary injunction based on exhaustion grounds where the university did not appeal the accreditation commission's decision before filing suit in federal court).

**B.      The College has failed to allege that exhaustion would have been futile.**

Under those circumstances, the only way the College can move forward with its common law due process claim is if its failure to exhaust is excused.

The D.C. Circuit has recognized an exception to the exhaustion requirement "where resort to administrative remedies 'would be futile because of the certainty of an adverse decision.'" *Commc'ns Workers v. AT & T*, 40 F.3d 426, 432 (D.C. Cir. 1994), quoting *Comm. of Blind Vendors*, 28 F.3d at 133 n.5. This futility exception is "quite restricted" though, *id.*, quoting *Comm.*

*of Blind Vendors*, 28 F.3d at 133 n.5, and it "has been applied only when resort to administrative remedies is 'clearly useless.'" *Id.*, quoting *Weinberger*, 795 F.2d at 105.

Thus, for exhaustion to be excused in this case, the College would have had to allege that it would almost certainly fail at each step of DEAC's administrative process. *See Commc'ns Workers*, 40 F.3d at 432–33 ("Even if one were to concede that an unfavorable decision . . . was *highly likely*, that does not satisfy our strict futility standard requiring a *certainty* of an adverse decision.") (emphasis in original). But plaintiff has not made those allegations, and the complaint does not contain facts to support the inference plaintiff is asking the Court to draw.

While plaintiff alleges that DEAC did not follow its own procedures prior to issuing the Show Cause Directive, *see* Compl. ¶¶ 19, 21, the complaint is devoid of any allegations that each level of DEAC's administrative process would have been marked by bias and unfairness.[13] And even accepting as true plaintiff's allegation that there had been some impropriety prior to the issuance of the Show Cause Directive, the College does not allege or show that the appeals process would not have exposed or corrected any underlying errors. The College simply states in its opposition brief that "there are factual allegations that the defendant is not following its own procedures and is biased." Pl.'s Opp. at 4. This falls short of pointing to facts that show an appeal was "certain" to fail.

---

13    Indeed, documents incorporated in, and attached to, the complaint reveal that after the College specifically complained of misconduct on the part of the Commission's Executive Director, she was recused from the matter and DEAC's legal counsel and members of the Executive Committee took over. *See* Compl. ¶ 40; Email Exchange.

The complaint does not allege that the College was certainly going to lose its accreditation,[14] or that even if it had, it was highly likely that the decision would have been upheld at each stage of appellate review. Because neither the Commission, an independent appellate panel, nor an arbitrator had an opportunity to render a final determination on plaintiff's claims, this Court, like the D.C. Circuit in *Communications Workers of America* "fail[s] to see any basis for finding that an unfavorable decision by [any of those reviewing bodies] was a foregone conclusion." 40 F.3d at 433.

---

[14] The only allegation that comes close is WLC's claim that the Show Cause Directive "effectively puts the College on notice that it is about to lose its accreditation." Compl. ¶ 19. But even this allegation does not directly address that there is a high degree of certainty that the College's accreditation is going to be withdrawn.

Because the College has not demonstrated that exhaustion of the agency's administrative remedies would have been futile, the Court will dismiss[15] the due process claim in Count I.[16]

---

[15]     Plaintiff argues that the Court should delay consideration of, rather than dismiss, this cause of action so that WLC may have the opportunity to exhaust administrative remedies. *See* Pl.'s Opp. at 4–5. Defendant argues that the Court should reject this option out of hand because WLC "has no pending application for accreditation with DEAC" since it "rejected DEAC's invitation to submit a new application for renewal of its accreditation," and allowed its accreditation to lapse. Def.'s Reply at 7 n.8. Even though the exhaustion in this case is based on prudential concerns and is not jurisdictional, *see Avocados Plus, Inc v. Veneman*, 370 F.3d 1243, 1247–48 (D.C. Cir. 2004) (describing both exhaustion doctrines), and the Court has the discretion to retain jurisdiction over the matter to avoid the necessity of commencing a civil action all over again should the administrative remedy fail to resolve the dispute, *id.*, at 1251, citing *Montgomery v. Rumsfeld*, 572 F.2d 250, 254 (9th Cir. 1978), the Court sees no reason to retain jurisdiction here since the College made the decision to forego administrative review and let its accreditation lapse, and there are no ongoing proceedings at this time.

[16]     DEAC also maintains that WLC's due process claim fails because it was not ripe for review when it was filed, Def.'s Mem. at 9, and the Court agrees. "The ripeness doctrine generally deals with when a federal court can or should decide a case. Part of the doctrine is subsumed into the Article III requirement of standing, which requires a petitioner to allege *inter alia* an injury-in-fact that is 'imminent' or 'certainly impending.'" *Am. Petrol. Inst. v. EPA*, 683 F.3d 382, 386 (D.C. Cir. 2012); *see also Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (holding injury-in-fact must be "actual" or "imminent"). And "[e]ven if a case is 'constitutionally ripe,' . . . there may also be 'prudential reasons for refusing to exercise jurisdiction.'" *Am. Petrol. Inst.*, 638 F.3d at 386, quoting *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003).

The purpose of the ripeness doctrine is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Sprint Corp. v. FCC*, 331 F.3d 952, 957 (D.C. Cir. 2003), quoting *Nat'l Park Hosp.*, 538 U.S. at 807–08. While the constitutional aspect of ripeness may involve the same impending injury-in-fact requirement that is necessary for standing, the prudential aspect of ripeness requires more: a court must "balance[] 'the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427–28 (D.C. Cir. 1996), quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967). The fitness of an issue for judicial decision depends on whether there are "contingent future events that may not occur as anticipated, or indeed may not occur at all." *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580–81 (1985), quoting 13A C. Wright, A. Miller, & E. Cooper, *Federal Practice and Procedure* § 3532 (1984). [Continued on next page].

# I. The College's state law claims will be dismissed.[17]

In addition to its due process claim, the College brings four state law causes of action: defamation, negligence, tortious interference with prospective business or economic advantage, and breach of contract. Defendant moved to dismiss each count under Rule 12(b)(6), *see* Def.'s Mem. at 14–17, and the Court will dismiss each count for the reasons explained below.

## A. Defamation

In Count III, plaintiff alleges that DEAC's act of "publishing its false and defamatory public Show Cause letter on its website constitute[s] defamation on the plaintiff." Compl. ¶ 46.

To state a claim for defamation, a plaintiff must allege four elements: "(1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in

---

[Continued from previous page]. Even if the College has alleged some injury as a result of DEAC's alleged procedural improprieties, prudential considerations favor dismissal. While the College expresses fear that it will not receive fair accreditation review, *see* Compl. ¶¶ 19, 21, and it takes issue with certain interlocutory procedural decisions such as the issuance of the Show Cause Directive, *id.* ¶ 19, the accreditation process had not yet concluded at the time the College filed this lawsuit, and the outcome – which could have been in plaintiff's favor – was unknown. So any alleged bias on the part of DEAC had not yet produced any adverse consequences, and the record upon which one would determine whether plaintiff's due process rights have been violated had not yet been developed. Further, the school was permitted to maintain its accredited status while it responded to the Show Cause Directive, so there was no hardship to the College in having to wait until the Commission made a final accreditation decision. Thus, the due process claim in the complaint was not ripe for review, and it will be dismissed for that reason as well. Indeed, since the College let its accreditation lapse, it is also arguable that the Court lacks jurisdiction because the dispute is moot.

17    Defendant points out that the Bylaws in DEAC's Handbook provide that state law claims are governed by District of Columbia law. *See* Def.'s Mem. at 15 n.13; Handbook at 150 ("The law of the District of Columbia shall govern the interpretation, validity, and performance of the terms of these Bylaws, as well as any dispute between the Corporation and a Member, former Member, or applicant for membership, regardless of the law that might otherwise be applied under any principles of conflicts of law.") (emphasis omitted). Plaintiff does not contest the applicability of D.C. law.

publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm." *Bean v. Gutierrez*, 980 A.2d 1090, 1093 n.2 (D.C. 2009).

Defendant maintains that this claim should be dismissed because DEAC was obligated by law to publish the Show Cause Directive, so the statement is privileged against a defamation claim. Def.'s Mem. at 15–16. The Court agrees.

Under District of Columbia law, a report required by law cannot support a defamation claim. *See McBride v. Pizza Hut, Inc.*, 658 A.2d 205, 207 (D.C. 1995) (holding that defamation claim based on statements to the Department of Employment Services that the plaintiff had been discharged for theft had to be dismissed because the report was required by law); *Goggins v. Hoddes*, 265 A.2d 302, 303 (D.C. 1970) (applying absolute privilege to libel claim based on a report required by law to be filed with unemployment compensation board that said the employee was discharged for dishonesty); *see also Klayman v. Judicial Watch, Inc.*, No. 06-670, 2007 WL 140978, at *17–18 (D.D.C. Jan. 17, 2007) (dismissing defamation claim predicated on alleged false statements about the plaintiff contained in defendant Judicial Watch's tax returns after they were posted on the non-profit organization's website because federal regulations required the organization to make the information available for public inspection), *vacated in part on other grounds*, 2007 WL 140978. Further, the Restatement of Torts provides that "[o]ne who is required by law to publish defamatory matter is absolutely privileged to publish it." Restatement (Second) of Torts § 592A (1977); *see also id.* § 577 (discussing that "publication" for purposes of defamation includes any communication to a third party).

Plaintiff argues that the regulation the Commission relies upon for requiring publication of the Show Cause Directive "only applies to *final* decisions," and it notes that defendant

"consistently tells us that its decision was not final." Pl.'s Opp. at 8 (emphasis in original). However, plaintiff's position is not supported by the regulations.

Section 602.26(c) requires an accreditation agency to provide "written notice to the public" of certain accreditation decisions. 34 C.F.R. § 602.26(c). Of relevance to the Court's analysis, such decisions include not only final decisions on the denial or revocation of accreditation, but also "[a] final decision to place an institution or program on probation *or an equivalent status*."[18] 34 C.F.R. § 602.26(b)(1) (emphasis added). In another section of the regulations, the rules specify that accrediting agencies must afford institutions certain due process protections, including notifying "the institution or program in writing of any adverse accrediting action or an action to place the institution or program *on probation or show cause*." 34 C.F.R.§ 602.25(e) (emphasis added). Therefore, the regulations indicate that placing an institution on a show cause status is similar, or equivalent to, placing it on probation, a publishable decision. Moreover, Department of Education guidance explicitly identifies show cause orders as a type of "probation or an equivalent status" event that would trigger the accreditation agency's reporting obligations. *See* U.S. Dep't of Educ., Clarification of Terminology and Requirements for Accrediting Agency Reporting to the U.S. Department of Education 4–5 (Nov. 17, 2016), https://www.americanbar.or g/content/dam/aba/administrative/legal_education_and_admissions_to_the_bar/PublicNoticeAnn ouncements/2016_11_17_accreditation_terminology_guidance_post_30_day_comment.authchec kdam.pdf.

Accordingly, a show cause order falls under the statutory language of "probation or equivalent status" in section 602.26(b)(1), and the agency was obligated to provide written notice

---

18      As defendant points out in its reply, it appears that WLC is "confusing the final decision made by DEAC to issue a Show Cause Directive with the absence of a final decision on whether to renew WLC's accreditation." Def.'s Reply at 3.

to the public of the Show Cause Directive it issued to the College. *See* 34 C.F.R. § 602.26(b)–(c). Because DEAC was legally required to publicize the Show Cause Directive, its statement is privileged, and the agency cannot be held liable for defamation. Therefore, the defamation claim in Count III will be dismissed.

### B.    Negligence

The College also brings a negligence claim in Count V, alleging that DEAC had a legal duty to provide it with fair and unbiased accreditation services, and that it breached that duty, causing it damages. Compl. ¶¶ 51–56. The Court will dismiss this count on several grounds: it is barred by the economic loss doctrine; the College has not plausibly alleged the necessary element of causation; and to the extent the tort claim is based on the publication of the Show Cause Directive, the claim is barred because the publication is privileged.

### 1.    Economic Loss Doctrine

To make out a negligence claim under District of Columbia law, a plaintiff must demonstrate that the defendant owed a duty to the plaintiff, that the duty was breached, and that the plaintiff suffered an injury that was proximately caused by the breach. *Aguilar v. RP MRP Wash. Harbour, LLC*, 98 A.3d 979, 982 (D.C. 2014). Defendant argues that the College cannot state a claim because the economic loss doctrine bars recovery of purely economic losses in negligence. Def.'s Mem. at 17. The Court agrees.

Under the economic loss rule, "a plaintiff who suffers only pecuniary injury as a result of the conduct of another cannot recover those losses in tort." *Aguilar*, 98 A.3d at 982, quoting *Apollo Grp., Inc. v. Avnet, Inc.*, 58 F.3d 477, 479 (9th Cir. 1995). The D.C. Court of Appeals adopted the economic loss doctrine in *Aguilar*, observing that it has been a "longstanding policy in courts around the country" that where "pure economic loss is at issue, not connected with any injury to

one's body or property, the reach of legal liability is quite limited." *Id.* at 983 (alterations and citation omitted).

There is a limited exception to the economic loss doctrine: a plaintiff may recover economic damages in tort if it can demonstrate a "special relationship" with the defendant. *Whitt v. Am. Prop. Constr., P.C.*, 157 A.3d 196, 205 (D.C. 2017) (finding a special relationship between construction company and business where the construction permit contained express terms protecting the business from effects of construction, and the construction project was long-term so the harm was not isolated or unexpected); *see also Aguilar*, 98 A.3d at 985–86. Where a "special relationship" exists, the defendant owes an independent duty of care to the plaintiff, and it is proper to hold the defendant liable for a breach of that duty. *Whitt*, 157 A.3d at 205. "'[W]hether the plaintiff's interests are entitled to legal protection against the defendant's conduct' is a question of law for [the court] to decide." *Id.* at 205, quoting *Aguilar*, 98 A.3d at 982.

In determining if a special relationship exists, the Court asks whether the defendant "had an 'obligation . . . to care for [the plaintiff's] economic well-being' or an 'obligation' that 'implicate[d]' the plaintiff's 'economic expectancies.'" *Whitt*, 157 A.3d at 205 (alterations in original), quoting *Aguilar*, 98 A.3d at 985. The Court of Appeals in *Aguilar* noted that a special relationship is unlikely to exist where "variables beyond [the defendant's] negligence could prove determinative of the likelihood of serious economic harm." *Aguilar*, 98 A.3d at 985 & n.4 (concluding that there was no special relationship because there was no direct connection between the commercial landlord and the plaintiffs, who were not tenants but rather employees of tenant businesses located on the property).

Here, plaintiff seeks damages for "loss of future Title IV eligibility, damages to its reputation, loss of students and concomitant tuition payments, loss of goodwill, loss of investors,

loss of donors and the potential loss of its entire business with damages in the amount of not less than" $17,400,000. Compl. ¶ 56. The College does not appear to dispute that it is seeking only economic damages. *See* Pl.'s Opp. at 8. However, it argues that it is entitled to damages because a special relationship exists between the College and DEAC. *Id.* In support of this contention, the College makes a brief argument, relying on a quotation from a non-binding case from another district that does not apply District of Columbia law. *See id.* at 8–9, citing *Wilfred Acad. of Hair & Beauty Culture v. S. Ass'n of Colls. & Schs.*, 738 F. Supp. 200, 208 (S.D. Tex. 1990), *rev'd on other grounds*, 957 F.2d 210 (5th Cir. 1992).

In *Wilfred Academy of Hair and Beauty Culture*, the court reviewed an accrediting agency's decision under a deferential standard, and it observed that "the common law . . . imposes an obligation of fundamental fairness on accrediting agencies in actions affecting accreditation." 738 F. Supp. at 208, citing *Med. Inst. v. Nat'l Assoc. of Trade & Tech. Schs.*, 817 F.2d 1310, 1314 (8th Cir. 1987). The court went on to state that "[a]n accrediting association's relationship to its member schools is a special relationship of trust and confidence," and that "[t]his relationship implies a duty of good faith and fair dealing, which is breached by a violation of fundamental fairness." *Id.* While the opinion uses the words "special relationship," the *Wilfred* court was not presented with the question of whether a legally cognizable "special relationship" existed between the parties for the purpose of tort liability for economic harm. *See id.* Rather, the court appeared to be taking cognizance of the common law duty underlying the due process claim in Count I that is well-recognized in this area of law. *See id.* And it certainly did not consider the issue under D.C. law.

The Court concludes that no special relationship exists here between the College and DEAC that would give rise to an independent duty in tort. *See Prof'l Massage Training Ctr.*, 781

F.3d at 181 (upholding district court decision dismissing negligence claim against accreditation agency under economic loss doctrine where no special relationship existed). First, the complaint makes no mention of a special relationship between the parties. It alleges that the College "placed its trust and confidence in DEAC" and depended on it "to provide fair and unbiased accreditation." Compl. ¶ 52. But there is no allegation that DEAC was obligated to WLC in any economic capacity. *See Whitt*, 157 A.3d at 205.

Moreover, inherent in the relationship between the parties, which is alleged in the complaint to be a contractual one in any event,[19] is the risk that the agency may not provide accreditation to the College if it does not meet its standards. *See Career Care Inst., Inc. v. Accrediting Bureau of Health Educ. Schs., Inc.*, No. 1:08-cv-1186, 2009 WL 742532, at *7 (E.D. Va. March. 18, 2009) (concluding that the school's negligence claim could not proceed on the basis that a "special relationship" existed because their relationship was the same as "any institution of higher education seeking accreditation," and that relationship includes the risk that

---

[19]    Yet another reason supporting dismissal of the negligence claim is that the College has not alleged "a duty independent of that arising out of the contract itself." *Choharis v. State Farm Fire & Cas. Co.*, 961 A.2d 1080, 1089 (D.C. 2008) ("[T]he injury to the plaintiff must be 'an independent injury over and above the mere disappointment of plaintiff's hope to receive his contracted-for benefit.'"), quoting *Tate v. Aetna Cas. & Sur. Co.*, 149 Ga. App. 123, 124 (1979); *see* Def.'s Reply at 14. According to the complaint, DEAC had an obligation to provide fair accreditation services based on the procedures in the Handbook. *See* Compl. ¶¶ 19, 52–55. Plaintiff alleges that "member schools agree to be bound" by the Handbook, and "DEAC agrees to apply [it] impartially to all member schools." *Id.* ¶ 19. Conduct during the course of a contract dispute may be the subject of a negligence claim "where there are facts separable from the terms of the contract upon which the tort may independently rest and where there is a duty independent of that arising out of the contract itself, so that an action for breach of contract would recover none of the damages suffered by the tort." *Choharis*, 961 A.2d at 1089. The issue here is that the acts upon which the College relies to establish its negligence and breach of contract claims are the same – that DEAC had an obligation to follow its standards and procedures, and that it failed to do so during the process that resulted in issuing the College a Show Cause Directive. *See* Compl. ¶¶ 19, 52–55. "The tort must stand as a tort even if the contractual relationship did not exist," *Choharis*, 961 A.2d at 1089, and here, it cannot.

the agency "may not provide accreditation to the institution"). Finally, the fact that the actions of the College itself could prove to be "determinative of the likelihood of serious economic harm" is yet another basis to conclude that no special relationship exists. *Aguilar*, 98 A.3d at 985 n.4.

Because the economic loss doctrine bars the College's negligence claim, the Court will dismiss Count V.

### 2. Causation

Defendant also argues that the College's negligence claim must be dismissed because the College has not plausibly alleged that the agency's actions proximately caused the College any harm.[20] Def.'s Mem. at 14–15. The Court agrees that this provides another reason to dismiss this cause of action.

In Count V, the College alleges that "DEAC has a legal duty to fairly and properly consider the College's application for re-accreditation." Compl. ¶ 53. It claims that the agency breached its duty by issuing "a public show cause letter" and for committing "other acts" such as when it "relied on the phony, fraudulent and defamatory fact finding" of its site-visiting team. *Id.* ¶¶ 53–55. And, according to the College, "[a]s a direct and proximate [result] of those breaches by DEAC of its legal duties . . ., the College has incurred damages . . . including . . . loss of future Title IV eligibility, damage to its reputation, loss of students and concomitant tuition payments, loss of

_____

20 Defendant makes this argument with regard to each of the College's state law claims, *see* Def.'s Mem. at 14–16, and the College does not appear to dispute that causation is an element of each claim. *See* Pl.'s Opp. at 7–8. The College also does not argue that it has set forth sufficient facts to state a claim under each cause of action. *See id.* It merely opposes defendant's position by trying to distinguish – in extremely conclusory fashion – the cases defendant cited in its motion. *See id.* As will be discussed in greater detail throughout the Memorandum Opinion, the remainder of plaintiff's state law claims will be dismissed for failure to state a claim because the College has not plausibly alleged that DEAC caused the injuries alleged.

goodwill, loss of investors, loss of donors and the potential loss of its entire business with damages in the amount of not less than" $17,400,000. *Id.* ¶ 56.

The problem with the allegations in the complaint is that DEAC did not withdraw the school's accreditation; WLC let it lapse. The complaint recites the harms that could have flowed from a loss of accreditation, but DEAC never had the chance to evaluate the College in order to reach that decision. Indeed, the College admitted that it chose not to pursue the Show Cause process further after DEAC issued the Directive, and it never filed the application for re-accreditation. Moreover, WLC's accreditation remained intact while it was under the Show Cause Directive. Because the College did not avail itself of the opportunity to demonstrate compliance with DEAC's standards, it withdrew from the process, and its accreditation lapsed. Thus, all of the alleged harms flowed directly from WLC's inaction rather than any action on the part of DEAC.

Because the College cannot plausibly allege that DEAC's actions caused it any harm, it has failed to state a claim for negligence, and this provides the Court with yet another reason to dismiss Count V.

### 3. Privilege

Further, to the extent that the College has based its negligence count on DEAC's publication of the Show Cause Directive, the claim cannot survive because that communication was privileged. *See McBride*, 658 A.2d 207–08 (dismissing the defamation count in addition to the injurious falsehood count because they were both based on the absolutely privileged communication). Plaintiff alleges in this count that "DEAC's issuance of a public show cause letter . . . breached DEAC's duties owed to the College," and that "[a]s a direct and proximate [result] of those breaches," WLC has suffered "damage to its reputation" and "loss of goodwill."

Compl. ¶¶ 54–56.  However, the College cannot merely repackage its legally flawed defamation count as a negligence claim.  Because the Show Cause Directive cannot form the basis of this cause of action, it will be dismissed for that reason as well.

### C.    Tortious Interference with Prospective Business or Economic Advantage

The College also brought a claim for tortious interference with prospective business or economic advantage, *see* Compl. ¶¶ 48–50, but this tort claim must also be dismissed.

A prima facie case of tortious interference with business relations requires:  "(1) existence of a valid contract or other business relationship; (2) [the defendant's] knowledge of the relationship; (3) intentional interference with that relationship by [the defendant]; and (4) resulting damages."  *Whitt*, 157 A.3d at 202 (alterations in original), quoting *Newmyer v. Sidwell Friends Sch.*, 128 A.3d 1023, 1038 (D.C. 2015).  The College alleges that DEAC "knew, or should have known, that by issuing its fraudulent public Show Cause Letter, it would materially impact" the College; that by issuing the Show Cause Directive, "DEAC intended to prevent the College" from offering prospective students to enroll; and that the Show Cause Directive caused the College the same harms as detailed above, including "damage to the reputation of the College" and "loss of goodwill."  Compl. ¶¶ 49–50.

Defendant again argues that this claim must also be dismissed because the College has not plausibly alleged that the agency's actions proximately caused the College any harm.  Def.'s Mem. at 14–15.  And the Court agrees for the same reasons outlined above, so Count IV will be dismissed.

Moreover, because the allegations in this count are based entirely on DEAC's publication of the Show Cause Directive, it must be dismissed since the College cannot state a claim based on that privileged communication.  *See McBride*, 658 A.2d at 207 ("In his complaint, appellant

alleged defamation and injurious falsehood on the basis of Pizza Hut's statement to [the Department of Employment Services] that appellant had been discharged for theft. This communication, however, cannot support either a defamation action or an injurious falsehood claim because it is absolutely privileged."), citing *Elliot v. Healthcare Corp.*, 629 A.2d 6, 9 (D.C. 1993).

Therefore, the Court will dismiss the tortious interference claim in Count IV.

### D.     Breach of Contract

In Count II, the College claims that it entered into a contract with DEAC and that the agency breached the contract and caused it harm. *See* Compl. ¶¶ 32–37, 44. But the College has failed to state a claim with regard to this count as well.

To state a breach of contract claim, a plaintiff must allege (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by the breach. *Tsintolas Realty Co. v. Mendez*, 984 A.2d 181, 187 (D.C. 2009). The College alleges that "[b]oth parties agreed to be bound by DEAC's Standards of Accreditation as set forth in the handbook, as a formal contract, which governs both conduct by the school and conduct by DEAC in its accreditation review."[21] Compl. ¶ 33. According to the complaint, the

---

21      While defendant did not move to dismiss the breach of contract count on the ground that no valid contract exists, there is a serious question about the existence of the alleged contract. As the Seventh Circuit noted when deciding whether contract principles applied to a school's challenge to an accreditation decision, "[t]he 'contract' the [s]chool wants to enforce is not a bargained-for exchange but a set of rules developed by an entity with many of the attributes of an administrative agency. Accreditation groups adopt and change their rules unilaterally; by posting an application fee a trade school cannot lock in a favorable set of rules." *Chi. Sch. of Automatic Transmissions, Inc.*, 44 F.3d at 449. The Fourth Circuit made similar observations in its decision upholding the district court's dismissal of the plaintiff's breach of contract claim against an accrediting agency: "The Standards of Accreditation do not constitute a binding contract between the agency and the accredited educational institutions because the Commission can alter the alleged 'contract' at will, and thus, is not bound by its terms." *Prof'l Massage Training Ctr.*, 781 F.3d at 181.

contract "included an implied duty of good faith and fair dealing," and WLC alleges in this count that DEAC breached that duty by "refusing to apply its standards of accreditation to the school in a fair and impartial manner," and by "[s]pecifically . . . issu[ing] a public show cause letter which was based upon unverified false data and was replete with defamatory falsehoods."[22] *Id.* ¶¶ 36–37. The College claims that, as a result of the breach, it "has incurred damages and will continue to incur substantial damages including, among other things, loss of future Title IV funding, damage to its reputation, loss of goodwill, loss of students and concomitant tuition revenue, loss of investors, loss of donors and the potential loss of its entire business with monetary damages of at least" $17,400,000. *Id.* ¶ 44.

---

[22] An argument could also be made that because the College's breach of contract claim is predicated solely on an alleged breach of the implied duty of good faith and fair dealing and not a violation of a specific term in the alleged contract, it is akin to a tort claim and the privileged nature of the Show Cause Directive could be grounds to dismiss this count as well.

Defendant moved to dismiss the breach of contract count on the grounds that the College has not plausibly alleged that the agency's actions proximately caused the College any harm. Def.'s Mem. at 14–15. And for the same reasons discussed previously, the Court will also dismiss Count II because WLC cannot plausibly allege that the claimed harms resulted from DEAC's actions.[23]

---

[23]    Defendant also argues that the breach of contract count should be dismissed because it is preempted by federal law. *See* Def.'s Mem. at 9–14. Because the Court has other grounds to dismiss this count, it does not need to reach the issue. But the breach of contract count raises significant preemption issues.

When addressing a preemption claim, the Court applies a "presumption against finding pre-emption of state laws in areas traditionally regulated by the states." *California v. ARC Am. Corp.*, 490 U.S. 93, 101 (1989). Congress's intent to preempt state law "may be 'explicitly stated in the statute's language or implicitly contained in its structure and purpose.'" *Cipollone v. Liggett Grp., Ltd.*, 505 U.S. 504, 516 (1992), quoting *Jones v. Rath Packing Co.*, 430 U.S. 519, 525 (1977). With this distinction in mind, the Supreme Court has identified three types of preemption: (1) express preemption; (2) field preemption; and (3) conflict preemption. *See id.*

Although defendant argues that WLC's breach of contract claim is field preempted by the Higher Education Act, *see* Def.'s Mem. at 14, and some courts have concluded that the exclusive grant of federal jurisdiction within the statute indicates that state law does not apply to claims challenging accreditation decisions, *see Thomas M. Cooley Law Sch.*, 459 F.3d at 712–13; *Chi. Sch. of Automatic Transmissions, Inc.*, 44 F.3d at 450, the D.C. Circuit has held that "[b]ecause Congress carved out particular contexts in which the HEA has preemptive effect, the conclusion is virtually inescapable that Congress did not intend to give the HEA preemptive effect in every context." *Jackson v. Culinary Sch. of Wash., Ltd.*, 27 F.3d 573, 580–81 & n.12 (D.C. Cir. 1994) (concluding that HEA did not preempt the field of federal education law, but noting that the enumeration of preempted areas in a statute does not foreclose the possibility that state statutes in actual conflict can be preempted), *vacated on other grounds*, 515 U.S. 1139; *see also Armstrong v. Accrediting Council for Continuing Educ. & Training, Inc.*, 168 F.3d 1362, 1369 (D.C. Cir. 1999) (holding that the HEA does not preempt the field of federal education policy regarding loan lending to students, but that the plaintiff's contract claims did directly conflict with HEA regulations and so those claims were preempted).

But defendant also argues that the breach of contract claim is conflict preempted, *see* Def.'s Mem. at 11–14, and the Court finds this argument to be more persuasive. A conflict occurs when compliance with both state and federal law would be impossible, or when state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *ARC Am. Corp.*, 490 U.S. at 100–01, quoting *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). A state law may pose an obstacle to federal purposes by interfering with the accomplishment of Congress's actual objectives, or by interfering with the methods that Congress selected for meeting those legislative goals. *Gade v. Nat'l Solid Waste Mgmt.*, 505 U.S. 88, 103 (1992), citing *Int'l Paper Co. v. Ouellete*, 479 U.S. 481, 494 (1987). [Continued on next page].

## CONCLUSION

For all of the foregoing reasons, the Court will grant defendant's motion to dismiss in its entirety. A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE: September 28, 2018

---

[Continued from previous page]. Plaintiff claims that DEAC breached the contract by not complying with the policies contained in its Handbook. Compl. ¶¶ 19, 33, 37. And the College alleges that the procedures in the Handbook were formulated based on requirements set forth in the Higher Education Act and its accompanying regulations. *See id.* ¶¶ 4, 19. Since plaintiff's breach of contract claim is only predicated on a breach of the implied duty of good faith and fair dealing, and not on a breach of any actual contractual term, *see id.* ¶ 36, it is hard to see how the alleged duty owed to the College could embrace requirements that may be contrary to what has been prescribed by the Secretary of Education and laid out in the HEA. Here, plaintiff predicates the breach of the implied duty claim on the Commission's publication of the Show Cause Directive, *see id.* ¶ 37, but that action was taken pursuant to regulatory requirements. Permitting such a state law claim imposing inconsistent obligations to go forward could certainly frustrate the federal policies concerning accreditation, raising a conflict preemption issue. *See Armstrong*, 168 F.3d at 1369 (concluding that the plaintiff's claims were conflict preempted by the HEA: "If accepted, [the plaintiff's] claim that she may void her student loan based on the school's alleged [Guaranteed Student Loan Program] eligibility would frustrate specific federal policies regarding the consequences of losing or falsely certifying accreditation. For example, it is the Secretary and guaranty agencies – not students – who enforce statutory and regulatory requirements, including those concerning accreditation").